Gregory, the United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning, please be seated. Welcome to the second day of our panel hearing in Birmingham. I'm glad to be here with my friends, Judge Newsome and Judge Brasher. Before we start, Judge Brasher has something he'd like to tell the lawyers about and then we'll get started. Yes, so this is our second sitting in Birmingham this year and it's been a long time since we've had Birmingham sittings until this year. And so we're considering whether to regularize Birmingham sittings or not. And you will get a survey after this argument about how well the judges did. No, I'm just kidding. You'll get a survey about the facilities and stuff like that. It's not junk mail. Just be great if you would respond to that survey so we would know whether this was worthwhile for you. OK, that's it. Responses are anonymous. So so please help us out by letting us know what you think. With that, we're ready to begin. You know, the red light system when the yellow light goes on, that means that your time is starting to draw to a close. So begin to wrap up. But if we take you beyond the red light, just keep going and we'll we'll keep having the conversation with that. We're ready for our first case. Three consolidated cases. Numbers twenty two dash one two eight zero zero twenty two dash one two eight zero nine and twenty two dash one two eight four three United States versus Ishmael L. Gregory et al. And we are starting with Mr. Lloyd. Is that right? Whenever you're ready. May it please the court. J.D. Lloyd for Appellant Rolando Williamson. I'd like to spend my time today talking about how the long term surveillance of Mr. Williamson's house implicated and violated his Fourth Amendment rights. In the wake of Jones and Carpenter, courts across the country are split about the Fourth Amendment implications of surveillance like what happened here. Mr. Williamson asked this court to join the split that recognizes how the Fourth Amendment is implicated by long term comprehensive digital visual surveillance. And there are two focal points that I'd really like to spend time today talking with the court about. And the first is what exactly is being captured and considering this evidence is this aggregation of information, the totality of what transpired. The courts can ask you a question of sort of theoretical doctrinal question first before you go. And maybe you can answer it in the course of your argument. Does your Fourth Amendment argument depend on the electronic nature of the surveillance or is it more based on long term surveillance? In other words, if the police had had the resources and the desire to do this exact same sort of visual surveillance through human eyes by having three officers rotate on eight hour shifts for these months, would your argument be the same? To answer your question, to the first part, I believe it's kind of almost yes for both questions, Your Honor, because number one, we've seen in the wake of Jones and Carpenter, the court and also other electronic cases like Riley, the court is taking a closer look at the Fourth Amendment and the intersection of developing technology, what technology is allowing law enforcement to do. Obviously, relying on Jones and Carpenter is kind of the focal points for those more than Riley and some of these other cases. But with the increase of the ability of law enforcement to do different things, to conduct long term surveillance that no one notices, it creates this larger question of what broader privacy rights are to be expected by the public. Well, I think I quite understand that, though. So, I mean, like if you put a police officer up on top of a pole, all the camera is doing is mimicking as best it can what the police officer's eyes could have seen. And the magistrate made a finding, right, that finding a fact that everything that was used in the warrant was visible to the naked eye. Well, sure. And I mean, perhaps if an officer had been perched on that pole, you know, continuously for 10 months, recording everything, not having to take breaks, not needing to shift, not needing to go. Well, you wouldn't need to have one officer. I mean, you can have like Judge Jordan suggested, you just have three officers that rotate. Well, I mean, I guess that that is theoretically possible. I don't think that that is, you know, an actuality, practical or something that the police would do in terms of explaining that. So, for example, in Carpenter, the authorities couldn't forget legality. The authorities could not have gotten the information that they sought without technological means. In other words, the data that the telephone companies had with regards to location information here is not quite the same. And so that's why I wanted to explore with you whether you think it's the length or the electronic means or a combination of both. Do they both have to be present? Is one OK or is the other one tippet over the Fourth Amendment edge? Well, I think that the practical considerations of what an investigation can do, coupled with what digital surveillance techniques or digital technology is allowing law enforcement to do is the important question that the court has to wrestle with. I do believe that the court in Carpenter and Jones both consider the idea of, well, could an officer technically surveil Mr. Jones or technically surveil Carpenter for this amount of time? And the answer, in our opinion, was that the court acknowledged that that could have been theoretically possible. Yeah, but the majority, I mean, the majority in Jones relied on a trespass theory.  So I take it there is no comparable trespass theory here. Yes, Your Honor. We're not arguing the trespass theory. We're thinking more along the lines of the second prong of Katz that was more, more. Reasonable expectation of privacy. Reasonable expectation of privacy. And so that's where I think it's the I guess the question is, I think you would have a much stronger case if this camera captured something that couldn't be captured to the naked eye. I guess what I'm trying to figure out is why does the length of time, because it seems like that's what you're saying, the length of time is what changes the analysis. Well, yes, Your Honor, I think that to kind of answer that, I'd like to give you a hypothetical. But maybe before I get to that, I'd like to just kind of look at the way that the majority or the split in this issue has looked at things kind of in the vein of Serallo and Florida v. Riley and Dow Chemical, where once something was seen, you know, law enforcement knew that a crime had been committed or that a crime was ongoing. And to think about the discrete moment in time that was visible from that plane flying over in Serallo or Dow Chemical or the helicopter in Riley, here we're talking about 10 months of continuous footage that is stored and captured, that's retrievable, that's searchable, that law enforcement can go back into. This is a different thing than just simply seeing something in a moment. And in the government's brief, the government included a picture of the break between the fence and the hedges at the Arlington Avenue house. And I'd like the court to consider what a passerby would see in that instance and how long a passerby, random neighbor or whatever, might see in that instance, just that one sliver of the backyard or whatnot. But over a 10-month period, a month's time encompasses about 2.5 million seconds, a little bit more. So over a 10-month period, there are more than 25 million seconds that are going on. And think about how short of a window a passerby would have in seeing that backyard. And that's why I come back to the idea of the aggregation of information that is now available to law enforcement from that. Can I ask you to address another thing about Jones? So it seemed to me that the concurring opinion in Jones, which is the one that you're relying on, suggested that there was a reasonable expectation of privacy in one's movements, you know, being tracked from one place to another, and that over time, you know, that reasonable expectation of privacy can be invaded by the government if they track you long enough. How is what the government did here comparable to that, given, well, and maybe I'm wrong about this, but I think given the limited amount of information they know about this person's movements? Does that make sense? It does, Your Honor, but I think that this is, you know, this is a question that needs to be looked at in the context of what was surveilled, Mr. Williamson's home and his property that he unequivocally owned. And while it's not detailing physical movements outside the home, like in Jones and in Carpenter, we're talking about a massive catalog of information that's being collected about his activities in and around the cartilage of his home. But doesn't Katz itself say what a person knowingly exposes to the public, even in his own home or office, is not the subject of Fourth Amendment protection? It does, Your Honor, but I think that the sentence that follows that talks about, you know, the opportunities for development of a situation where there is a reasonable expectation of privacy in your movements, I think that that's what this case comes back to. And your position is that Carpenter has sort of shifted that or moved that needle. Yes, Your Honor, I think Carpenter dealt with location information and had someone, some police officer on the ground, tailed the person, they would have been able to figure out that person's location, and yet Carpenter found a Fourth Amendment interest. Right, and I think that, you know, clearly Carpenter and Jones deal more with movement outside the home, and clearly we're not dealing with movement outside the home per se here. Carpenter expressly brackets this question, right? Says we're not calling into question conventional surveillance techniques like security cameras. That's true, but I would question whether they really had in mind this sort of massive comprehensive surveillance. And real quick, Your Honor, I was going to give you a hypothetical. My wife and I love to take our girls out to our driveway to play cars. They ride their bikes. They ride their scooter. And the way that our driveway is positioned, a bystander couldn't see anything from the backyard, couldn't see anything from the side of the house. And effectively, because of shrubbery on one side, you can only see what's happening if you're driving past our driveway and you see down that we're down there playing. And I think to kind of step back to your question, Judge Jordan, where I'm trying to draw the court into is I would not expect, I would have a reasonable expectation of privacy in what we're doing there, and that someone is not recording all 10 months of us playing cars outside, as the girls call it, playing cars over that 10-month window. Yes, my neighbors, the cranes, they may walk by and see us out there and say, hey, a neighbor down the street might likewise walk by and see us. But that 10-month window, we would have an expectation of privacy in that totality of movement. Last question, then you can save the rest of all of your time for rebuttal. If it's long term, what's the dividing line? If they had done this for a week, Fourth Amendment violation in your view? A week, I think that we would still kind of probably need to come back to the timelines talked about in Carpenter and Jones. And I think that a dividing line at those timelines would be appropriate for this court. Okay, thank you very much. You've saved your time for rebuttal, Mr. Lloyd. Yes, sir. Ms. Humber. Whenever you're ready. Good morning, and may it please the court. My name is Gabrielle Humber. I hear for Appellant Ishmael Gregory. Mr. Gregory was convicted of count two of the indictment for conspiracy to possess with intent to distribute controlled substances. He was ultimately sentenced to 40 years for that. And then count 13, distribution of cocaine, which he was sentenced to 30 years to be served concurrently with the 40-year sentence. The two issues that we had presented for your consideration are one, whether the district court abused its discretion by sentencing the appellant to an unreasonable term of years. And two, whether the district court erred in denying his motion for judgment of acquittal based on the sufficiency of the evidence. Can I jump in for a second? Sure. This is my personal assessment of the record. But I think that, and I want to say it now so that the government's attorneys can be ready to respond. I think your client got an extra 10 years that the district court could not have imposed given the count of conviction. So let me tell you what I how I read the record. The government charged him with a conspiracy to possess with intent to distribute a number of different drugs. The jury was given a long verdict form with for each defendant on count two with each type of drug and the amount of drug, right? Correct. The only thing they found Mr. Gregory guilty of was a conspiracy to possess 500, less than 500 grams of cocaine with the intent to distribute. Right so far? Correct, Your Honor. Okay. Title 21 of the criminal code, specifically Section 841B1C, if I'm right, says that for a conviction involving less than 500 grams of cocaine, the default penalty is what? Do you remember? And Judge, typically I could say- Zero to 20 years. Correct. Right? Yes, Your Honor. Okay. That provision also says that if you have a prior serious drug felony, that 20 years can go up to 30 years. In my opinion, that's the cap for Mr. Gregory on count two. A judge can make findings under a preponderance of the evidence standard based on relevant conduct that takes the sentence all the way up to the statutory cap, but it can't go beyond. All of this problem started, I think, with the pre-sentence investigation report, which said that the maximum on count two was 40 years, because it carried over the penalty provision from the indictment, which had charged him with a higher level of cocaine. And that problem persisted all the way through sentencing. And it has persisted all the way through the appeal. So I only speak for myself, but I think Mr. Gregory could only have received, given the count of conviction and Apprendi, he could not have been sentenced to anything more than 30 years on count two. So if I'm right, he's going to get 10 years shaven off his sentence, but for something that nobody has talked about. Can I ask you a follow-up question to Judge Jordan's question? Sure. If he's right and the sentence is above the stat max, should we remand to the district court to re-sentence, or should we just say, give the guy the stat max? And, Your Honor, I think that it would probably need to be remanded for re-sentencing, from my understanding. And if I could, one of the things under United States v. Booker is that an appellate review of sentencing is determined as to whether the sentence itself is reasonable. And so aside from the statutory limits of the sentence itself, we would argue that even if these issues of the other drugs that Judge Jordan had mentioned were attributed to him, that they were unreasonably attributed to him. Yeah, but a district court can make those fact findings at sentencing, right? And, I mean, the district court here cited, I think, two witnesses for the purpose of making those fact findings. Sure. And, Your Honor, I would also note... Well, so then we don't review those fact findings for clear error? Yes, and so the facts themselves, I believe, would be determined under clear error. But I would note that the only two people who gave any sort of testimony implicating Mr. Gregory in the conspiracy itself were two people who received deals in order to testify against him. Yeah, and so that seems, I mean, if I were a fact finder, that seems like an argument that you could make to me about that. But, I mean, it just seems like the district court said, well, I'm going to credit this, and that's kind of where we are.  And, again, I think that the preponderance of the evidence had to be met in order for those additional drug quantities to be attributed to Mr. Gregory. And, again, I think the significant jump from his base offense level going from 14 to 38, based on a significant amount of drugs that the jury didn't attribute to him, is significant in his case. Based on the district court's factual findings, and putting aside the issue I think there may be with Mr. Gregory's sentence, what did the guidelines score out for him? Sure, and so the drugs that were attributed to him, other than what the jury found, that was the heroin and methamphetamine. And so, prior to those, he would have had a base level offense of, again, 14. And so that would have made his sentencing range just a couple of years. No, no, no, but my question presupposes or assumes that the district court's factual findings were correct, or at least not reversible error.  So what did the guidelines score him out to be? Right. What were the district court's factual findings? What were his advisory guidelines? Sure, and so I believe with his previous conviction it would have been the 360 to life. Okay. Okay, all right, thank you very much. Thank you. Mr. Steen. Good morning, your honors, and may it please the court, Russell Steen, representing Adrian Taylor. Actually, as far as argument goes, we pretty much will stand by our brief. I don't see any additional facts that we can put in that would help our case. One of the issues you raised, Mr. Steen, was that at most the evidence, in your opinion, showed a mere buyer-seller relationship with others. Did the district court give a buyer-seller instruction to the jury? No, your honor, they did not. Was one requested? Not to my knowledge. Okay. And actually, in the scope of everything, everything that transpired was so far away from the center of this conspiracy. And to take into account the feelings of Mr. Williamson and Mr. Taylor toward each other. I mean, they hated each other. Right. You said he had no relationship with Mr. Williamson and he didn't appear until about sometime in 2019. Correct. Now, we'll go back and say that Kenneth Taylor, I mean, Kenneth Johnson, testified that they were selling drugs early 2010s, 2012, long in there together. And they did that for several years. And then there was a span that they didn't sell drugs together. And then closer to the end of this conspiracy, they started selling drugs again. So that testimony was against Mr. Taylor also. Right, so if I understand right, you've got Williamson who supplies to Johnson, right? No, no, that's not right. Johnson was never supplied anything from Williamson. Okay. Johnson received his drugs from Taylor. Oh, he received them from Taylor. Yes. And then he and Gregory sold drugs together. I'm not aware that Taylor was tied in with Mr. Gregory. No, I'm sorry, Johnson. Yeah, Johnson. I guess I'm saying the tie-in is through Johnson, right? Yes. Okay. Okay, Mr. Steen, thank you very much. Thank you, sir. Ms. Wallace. Good morning, Your Honor. Allison Wallace here for Mr. Archie. May it please the Court. The main argument I make in this brief is that the judge impermissibly allowed a case agent to testify to a conversation he had heard on the telephone or that had been recorded on the telephone and let him interpret that conversation. What he heard was, and I'm paraphrasing, have you got a cup or half of that ice, I believe is the basic conversation. And the agent was allowed to testify as to the amount of drugs and that the drugs were meth. Although, under cross-examination, the agent admitted he really had no idea of any methamphetamine trafficking because they hadn't seen it before. So I would argue that that invaded the province of the jury to allow this agent to testify to a term or the meaning of a term that he had never heard before. Was there a Rule 702 objection lodged when he provided this testimony? Yes, Your Honor. And then we went to, well actually the jury was dismissed for the day and we went to sidebar and the judge overruled and said that he could testify to that because he was testifying as an expert and he could testify as a lay witness also and say it was common sense to say that when they're talking about ice, they're talking about methamphetamine, even though he didn't have any real knowledge of methamphetamine trafficking. And further, Your Honor, I would say that with Mr. Archie, he's a latecomer to the conspiracy and he only gets tied up in this conspiracy because of the phone call. All right, thank you very much. Thank you. Ms. Wallace, Mr. Steen, we know that you're CJA appointed and we thank you on behalf of the court for your service, not only to us, but to your clients as well. We appreciate it. Pleasure, Your Honor. Okay, Mr. Billingsley. Can we start with Mr. Gregory? Yes, sir. May it please the court, Michael Billingsley for the United States. Let me just say this. I didn't have time to figure it out there at the table, but I will say with the court's permission, we can submit something if we agree with the court. You can submit something even if you don't agree with the court. Right, right. Well, what I would say, though, is if you're correct, and I have no reason standing here today to say that you were because this wasn't raised, I mean, you're incorrect. We would concede that he can't be sentenced above the statute. Yeah, I just think the government charged him with all sorts of drugs and quantities that, if proven to a jury, would have allowed the sentence he got. But the jury, unlike others, found him guilty only of cocaine and with the lowest possible amount, which is less than 500 grams, which is the default penalty, 0 to 20, increased to 30 with the conviction. But there is nothing else. And then what happened, I think, and you can go back and we'll let all of you file supplemental briefs in 14 days. I think the PSI carried the penalty provision that was alleged in the indictment based on the quantity alleged in the indictment into the report. And that got carried into the sentencing hearing by mistake and then into the judgment as well. So if you look at the judgment, it has the penalty provision for the higher cocaine threshold that was charged but not filed by the jury. So, yes, both of you can file supplemental briefs within 14 days. I understand that makes sense. And, again, if it's above the statute that was available, we would concede that that's an illegal sentence and should be vacated for that reason. Let me turn to the poll camera. The district court in this case properly determined that the surveillance conducted by the poll camera was not a search and thus did not implicate the Fourth Amendment. For decades, the Supreme Court, as some of the questions alluded to, has held that activity in public view is not subjected to Fourth Amendment protections. I think, as Judge Newsom, you said, and Katz, the court said, what a person knowingly exposes to the public, even in his own home or office, is not subject to Fourth Amendment protection. And more recently in Kylo, the court noted that since the founding, a mere visual observation without a trespass is not a search. It's been applied specifically to the home in Cirillo where the court said that the Fourth Amendment has never been extended to require a law enforcement officer to avert his eyes from something he can see from a public vantage point. Do you think there's any, is there any limitation to that? Think about a swarm of drones around one's house or something. Is there any Fourth Amendment limitation to something exposed, sort of naturally exposed to the public? Can you repeat that? I just wonder if there's any limit to the proposition that the Fourth Amendment doesn't concern itself with things exposed to the public. And I'm trying to imagine the most far-fetched conceivable example, not just a poll camera, not even just a stationary security camera, but say a swarm of circulating drones around one's house. I don't think, I mean, the issue of Carpenter in this case, that there's a limitation except what was recognized in Carpenter, and that is what was a seismic shift in technology that allowed the police in that case access to information that was previously unknowable. The right to privacy recognized in Carpenter was based on a societal expectation that police or anyone else could not, and in fact in the main, according to the quote from Justice Alito's concurrence in Jones, would not be able to obtain that kind of information. And that's the right of privacy that was contravened by accessing the CSOI records. But you understand that there's, you may be right legally as everything stands now, but you understand that there's a concern about these maybe far-fetched hypotheticals and whether or not society would be prepared to regard them as reasonable. If you had four drones, one at each corner of a house, and every time one of them needed a new battery or a power source, you'd swab it out. And you had that surveillance going on for two years, and you had it at a high enough level that a human being couldn't really tell that they were focused on his or her house. That provides some sort of concern. I'm not saying it crosses the Fourth Amendment line. I don't know. But that's, it feels different. I understand your argument. The constant 24 hours, seven days a week, 12 months a year, that feels different than what the human eye would be able to view. Because human beings don't engage in that sort of activity. Human beings can't position themselves, you know, 500 feet above a house and just hover, or at least they can't right now, and look at you for two years. Right. So there's this concern about the surveillance state, and it's too, this is, I'm speaking for me only, it's a little too simple to say a human being could have seen it in the story. It may not be that simple. Well, I think there'd be issues about whether the drone was capturing things that were visible to the public. No, assuming they captured what people, had they been able to hover individually over the house, would have been able to see. Well, I think under current Supreme Court precedent, right, that if it's visible from a public vantage point, and we're talking about, that might represent some seismic shift in technology that would be more in line with what Carpenter talked about. But what we're talking about in this case is a conventional technique and tool of surveillance that officers have been using for decades. The reason this litigation is really sort of exploding now is because of Carpenter. But it's interesting that, you know, I'm speculating a little bit here that why there's no cases in the 11th Circuit about this is because I think nobody ever considered that it was an issue. Let me just give you a cautionary note. We got Carpenter wrong. Free Carpenter. So, and we, the majority of us were, and I was in the majority, I concurred separately, but I was in the majority, and the Supreme Court later told us, eh, you guys quite didn't get it right. It's not that simple. The third party doctrine stuff, not applicable here, even though technically, literally, if you follow the third party doctrine, you'd say, yeah, it fits. So, this stuff is moving. I understand. The plates are shifting. I understand. I think that what you said in the 11th Circuit in the Carpenter issue in Davis, the Supreme Court was very explicit about this is very unique. It took it out of the third party doctrine again, I think, because this was information that was previously unknowable. Right? This is a seismic shift in technology allowed police access to what the court was explicitly described in terms of such as like encyclopedic, you know, that you could, that person has been effectively tailed their every movement, everywhere they've been, in public and private, for the last five years. I have a record question for you. So, what, so I looked at the pictures in the record, and I just, I wasn't exactly sure on this. The poll camera is directed at the house. Is it viewing from an angle that like a passerby could see? Or is it viewing from something more akin to what the hypotheticals have been from like an elevated position looking down at the house where no one could actually stand? Right. It was elevated. It would be seen from a higher vantage point than a person standing. Again, we don't know exactly how high it was, but it was higher than any normal person would be tall. It's higher than the fence, right? Right. It's higher than the fence was. So why doesn't that, I mean, why doesn't that matter in the sense that if you're behind, you know, I mean, this house didn't really seem to have much of a privacy fence. I mean, it had like some hedges and stuff around it. But, I mean, if you build a 10-foot fence around your house and then are in your backyard, why don't you have an expectation of privacy about what goes on in there? How is that somehow different than if you put a roof on it? Well, because the fence was just partial. And so what the factual finding was referenced in the questions earlier was that everything that the poll camera saw was visible from somebody just standing on Carolina Avenue. Well, but you just said that's not true, though. You said that you'd have to be in an elevated position, like on the polls. I'm sorry. Is the factual finding that everything the poll camera saw was visible or everything that was used in the warrant, used to obtain the warrant was visible? You're correct. So the poll camera might have caught other stuff, and I had no idea, but maybe the cops or whoever said we're not going to use that stuff. We'll use this other stuff to try to get the warrant. Is that how it worked? Well, I don't know about the reasoning, but you're absolutely right. There's nothing about whether there was other things. What's clear in the record, what the factual finding is, is that the six references in the affidavit for the search warrant were viewed things that were visible from the public roadway. And there's one picture I should have included in the brief. I regret not doing it now, but if you look at the government's response to the motion to suppress, and I don't have a document number for you, but it was filed December 23rd of 2020. There's a picture of in-person surveillance. So an agent was driving down that alleyway and got a picture of cars exactly in the same position as the pictures in the brief, close enough that you could see the tag number. So it shows that's just further evidence that the things that were visible that were used in the affidavit to get the warrant were visible to somebody just driving down or walking down this public roadway. So I don't think the vantage point has really any concern or should be of any concern to the question before the court, which is whether this information constitutes a search. It might theoretically be an issue, but maybe it's just not an issue in this case. Correct. I mean, if you had a vantage point that was seeing things that you couldn't see from the public point of view, that would be a different case, I think. I mean, if you had a privacy fence all the way around the yard and the camera was positioned to see what somebody couldn't see walking down the street, it would be different. But that's not an issue in this case, based on the factual finding that we think hasn't been challenged and certainly isn't clearly erroneous. Right, because it seems to me like there are two sort of moving parts to this. One is for the purpose of the Fourth Amendment challenge. One is what the poll camera can see, and that's kind of what we've been talking about. And the other is the time period that the poll camera is there. And it seems like on the what the camera can see, at least in this case, the evidence that it can only see things that would be a passerby would be able to see. Or at least that's only what was used in the affidavit. Correct. We would say that what the camera can see is not an issue in this case. Not that it wouldn't be an issue in other cases, perhaps, but it's not an issue in this case. To further distinguish it from Carpenter, this is evidence of the CSLI information that was at issue in Carpenter is not available to the public. But the information here is, as a general matter, and the technology is available to the public. The cameras are everywhere, ubiquitous. People's, you know, ring doorbell cameras capture what's going on across the street in their neighborhood. So there's no, again, no shift in technology from that point of view either that would warrant looking at this differently than you would have in 1987, which is when the first Court of Appeals opinion addressing this that I found, and I think consistent with the other cases I read, that's the first one from the Fifth Circuit in 1987. I mean, I guess to Judge Jordan's point earlier, the wicked circularity of this, and this isn't our problem to fix. It might be someone's problem to fix, is that the more pervasive surveillance becomes, the less reasonable your expectation of privacy in your daily life becomes. And therefore, it just sort of spirals into a negativity vortex or something where you have no reasonable expectation of privacy in any aspect of your life because there's a security camera on every corner. Correct. I mean, I think that obviously there could be legislative fixes for things like that. But I'm just saying under current law, Supreme Court precedent, that what happened here was not a search. The district court was correct to find that. I think he alluded to just a little bit the breadth and depth of information that was obtained by CSLI. It's nothing like what's obtained in a case like this. This is capturing a single location, only what's in the view of the camera. When someone comes in view of the camera, it's not capturing the whole of a person's movements throughout their day, their week. And it's hard to recognize. It could be even years. The retrospective nature of the CSLI information is different. This was an investigation that began in March 2016. They didn't put this camera up until October 2018. It was something that was monitored regularly. It was part of an ongoing investigation. It was there to further the investigation. It's not like Carpenter where you say, oh, there's a crime been committed. We think we have a suspect. Let's go see what he's been doing for the past two years every moment of every day. Completely different in terms of the information that's at issue. Unless somebody asks you to go back to it, would you mind moving on and addressing a question I had about Taylor, the sufficiency of the evidence with respect to Taylor? Sure. One thing that I don't think was mentioned, Isaiah Thomas testified that he obtained resale quantities directly from Williamson, and he sold heroin to Taylor, resale quantities to Taylor. Is there evidence, though, I guess maybe this is Judge Brasher's question and certainly my question, is there evidence that Thomas obtained that heroin from Williamson? There is. His testimony that he obtained it from Williamson. There's what, I'm sorry? His testimony. Isaiah Thomas testified and said that he obtained it from Williamson and then sold it to Taylor. And there's text messages that corroborate that as well. And so how does that, I mean, I guess the real question is like, what is enough to make a jury issue on this conspiracy question? But is it just a jury question whether he's actually part of that conspiracy because he's a part of the supply chain? Or is it some point at which the heroin passes through so many hands that you can't say these people conspired together? Well, you don't have to know everybody on the conspiracy. You don't have to be aware of anybody on the conspiracy. You just have to know that there's an agreement and that you voluntarily joined the agreement. So I think that, you know, the case law is clear that you can be somewhat removed from maybe the general hub of the conspiracy but still be part of the conspiracy. What's the best evidence against Mr. Taylor? Well, I would say that. Part of his membership in the conspiracy. I would say if you're looking for a direct connection to Williamson, which I'm not saying that's required, but if you are, that's here. That's Isaiah Thomas' testimony that he was buying drugs from Williamson, providing those to Taylor for resale. How often did that happen, according to Thomas? I don't have that in my notes, Your Honor. I apologize how often it happened, but it was – let me make sure I don't have it in my notes. We have cases, and I understand Judge Brasher's point that if reasonable minds could differ, it may be a jury issue. But we have cases that strongly suggest that a one-time purchase does not necessarily a conspirator make. I absolutely agree with that, Your Honor. But this – I can't say how many times or what period of time. I just don't have it in my notes, but it was multiple times. Again, there's text messages corroborating that this was going on between Thomas and Taylor. And, you know, I think if you look at the – Was that contact limited to one type of drug or various types of narcotics? The Thomas – It was heroin. Thomas and Taylor was heroin, but the Kenneth Johnson testimony involved heroin and meth. And, you know, Johnson said that Taylor would have as much as a pound of meth at a time for resale. So I think if you look at the brief, my recollection is that really the attack on a sufficiency there was just that these witnesses weren't credible, and that's not a basis, you know, to overturn a jury verdict. But the jury only found Mr. Taylor guilty of a conspiracy involving, on count two, methamphetamine weighing 50 grams or more. So how does the heroin play into the conspiracy charge? I can't speculate as to what the jury was finding. They found enough to find that he was involved in the conspiracy. He was guilty of the conspiracy. Sure, but if you're telling me that the evidence that ties him is heroin evidence, and he gets to get convicted of heroin, and he gets convicted of meth, you need to point to some evidence that shows that he was involved in a conspiracy to possess with the intent to distribute a quantity of meth, right? I don't know that I have to show that. I mean, if the jury found he was guilty of the conspiracy, then I have to show that they totally rejected this other evidence. But they found him guilty of a conspiracy with regard to a specific substance and amount. I have in my notes that Johnson testified that Taylor had more than a pound of meth. I mean, it sounds like Johnson is the key witness in all this. That's what I have in my notes, too, that he said at times he would have at least more than a pound of meth. And so it seems like the way this trial went is a lot of it just turned on the credibility of the cooperator, and the jury found this person credible and said that all these guys were in a conspiracy together because of that testimony. They could find him credible, but they could find him credible as to involvement in the conspiracy, but maybe not find as credible the amount that the witness testified to. So I just think going and looking at it from that point of view is not the way the court should look at it. Was there sufficient evidence to find that he was involved in the conspiracy? There was. He says that the witnesses who testified to that weren't credible. But, again, that's a jury question that the court generally won't revisit unless there's some reason to think that their testimony was, you know, they were testifying about something that was possible for them to know. Could I get you to address the agent's testimony? About the cup of ice? Correct. Sure, sure. So the district court in this case took, you know, extensive measures to make sure the jury understood when he was testifying as an expert, when he was testifying as a fact witness, he testified two different occasions to make that clear. And when he was an expert witness, he testified that ice meant methamphetamine. So when this testimony— And he was qualified as an expert, and you disclosed him as an expert, as a Rule 702 expert? Your Honor, I'm sorry. I can't—I assume so, because that was an issue in the case, and the court was, again, made sure that the jury understood the difference. So I'm assuming that happened. There certainly wasn't anything that— How was he qualified as an expert on the stand? By talking about his—he's been doing these kind of cases, drug cases, for 15 years, maybe at the time of trial, but it would have been more like 16 or 17. But—so that he was familiar with these terms, that ice means methamphetamine, that type of questioning. And I don't think that there was an objection that he wasn't an expert in that regard. I think—but again, that wasn't the way this issue was brought up. The issue is, when he said a cup of ice, of course, ice wasn't the issue, it was the cup. And he said cup, he understood that to mean an ounce, maybe half an ounce of methamphetamine. There was an objection. He testified outside the presence of the jury and basically just said, that's based upon my knowledge of drug prices in the area of Birmingham. I just assumed, you know, based on my knowledge, that that's about what the quantity was. But the cup didn't have any specific meaning to me. And then the other thing I would say about that, that any prejudice, which we don't think there was any, would be harmless because, for what you're talking about before, the jury didn't convict that particular witness, Archie, of any quantity of methamphetamine. Right, so Archie was not convicted of methamphetamine. The quantities attributed to him were only marijuana, right. With respect to the Court's time, if the Court has no further questions, we would just ask that the Court affirm the judgment below, subject to us looking into what you brought up, Judge Jordan, and letting you know about that. All right, thank you very much. You and Mr. Taylor's counsel have 14 days from today, so you can file seven-page letter briefs on the issue. I'm sorry, Gregory, I'm sorry, thank you. Too many names. My apologies. So, 14 days, letter briefs, not to exceed seven pages on that issue with regards to Mr. Gregory. Okay, Mr. Lloyd. Thank you, Your Honor. Just real quickly, to the record question that Judge Brasher posed about the sight line of the camera, I believe that a picture that shows the angle of the camera was admitted as Exhibit 2 during the December 30th suppression hearing, and that shows an accurate angle of the poll camera that was stationed at the back of the house. One point that I wanted to kind of quickly respond to that the government brought up is talking about the CSLI and Carpenter and how that revealed so much more information than what is being discussed here. And I don't think that that's very accurate. I don't think that this Court should look at what was disclosed in Carpenter, so much more exposure to an individual than what a 10-month recording of someone at their home could display. Again, you know, I hate to bring the case back to myself, but if we had that hypothetical camera recording me and my actions at my house, you know, someone would have seen me carrying in a bag of Chick-fil-A. They would have seen me bringing in a humidifier just yesterday, maybe thinking, well, there's someone at home that's sick that can't help them get something to eat. And think about this again in the expanse of 10 months. And this is why I try to draw the Court's attention back to the concept of the aggregation of information and looking at it in the totality. And, Judge Newsom, I'm sorry I didn't have the citation right in response to your question about cats, but the sentence that you read from cats I believe is followed right by the line when an individual seeks to preserve something that's private and his expectation of privacy is one that society is recognized as reasonable, then the Fourth Amendment is implicated. And I think – So then I guess the distinction the Court seems to be drawing is things that you knowingly expose to the public, things that are sort of in public view, and things that you seek to sort of retain privacy. And this is sort of, I don't know, what makes Kylo different, right? Is that Kylo is seeking to like pierce the walls of the home and look inside, something you've sought to keep private. But something that is, I don't know, like, you know, I live in a house with lots of windows. And I just have to assume that sometimes my backyard neighbors are watching me watch television or whatever. And that just kind of is what it is. Sure. And, you know, you gave the example of the roving band of drones that constantly films someone's house for 10 months and exposes that. I think that we could likely agree that most everyone in the public would agree, maybe generally speaking, that that's an invasion of privacy. Fourth Amendment scholars might disagree. But I think the general public would have a reasonable expectation of privacy that the government couldn't just fly a horde of drones around your house and observe everything you do. And I think that that comes to the question of does the Fourth Amendment require somebody to create a perfect shield of all of their activities that could possibly be exposed? So here's one response, I think, to these hypotheticals, is that in Jones, the Supreme Court says if there's a trespass involved, it's a search.  Why isn't that, and maybe that's not, like, going to solve every potential problem, but why isn't that enough to not be worried about this? That, you know, if there's a drone in your airspace, then that's a trespass in natural theory. My response would be that I think we have to look at what Carpenter said in the majority, not one of the special writings, in talking about it's the court's duty to protect the protections of the Fourth Amendment against the encroaches that this digital age and technology can prevent. And we would argue that, again, stepping back to kind of a generalized discussion of this issue, we don't believe that the Fourth Amendment requires someone to create an impenetrable dome over all of their activities, lest this first sentence in Katz that you reference applies and that the Fourth Amendment goes out the window. Because what sort of conceivable situation could someone, could the government conceivably see anything without a physical trespass with a perfect shield around their house? There's not an example I can think of off the top of my head that would keep somebody being able to do something outside their house and still have an impenetrable shield. And that's why we say, that's when we come back to the concept of these discrete moments in time in Sorrello, Florida v. Raleigh, and now Chemical, they're not, we believe that Carpenter and Jones have kind of shifted the paradigm on how that needs to be considered, especially in the context of long-term visual surveillance. Of course, we concede that they reference visual surveillance kind of in the typical law enforcement stakeout situation, but we think that when you look at the aggregation of all of this information that is combined in a video that basically shows everything someone does in a 10-month window outside their house is something that the average person would believe violates their right to prophecy. And as such, we believe that the government should have gotten a warrant in this case to get this information and to have this information. Thank you. Thank you all very much. Thank you.